UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF RHODE ISLAND *ex rel.* TIMOTHY P. MURPHY, M.D., Plaintiff, v. RHODE ISLAND MEDICAL IMAGING, INC., Defendant. | C.A. No. 18-cv-564-JJM-LDA |

# ORDER

Plaintiff Dr. Timothy P. Murphy sued his former employer, Rhode Island Medical Imaging, Inc. ("RIMI") for wrongful termination and breach of contract after RIMI fired him when he did not directly supervise a trainee performing a medical procedure. His complaint contains six counts: Count I – Federal False Claims Act; Count II – Rhode Island False Claims Act; Count III – Rhode Island Whistleblower Protection Act; Count IV – Breach of Contract; Count V – Breach of the Covenant of Good Faith and Fair Dealing; and Count VI – Declaratory Relief relating to the Stockholder Agreement. Both parties move for partial summary judgment – Dr. Murphy moves on a contract interpretation issue arising from Count IV (ECF No. 85); RIMI affirmatively moves on Counts I, II, III, and VI. ECF No. 87. In response to Dr. Murphy's motion, RIMI cross moves on Count IV, advocating that the Court adopt its interpretation of two sections of the contract implicated in that count. ECF No. 92-1 at 3.

Before the Court is the matter of contract interpretation that will guide the eventual disposition of Dr. Murphy's breach of contract and breach of the covenant of good faith and fair dealing claims, RIMI's motion for summary judgment on Dr. Murphy's statutory retaliation claims, and a damage issue relating to RIMI's buyout of Dr. Murphy's stock upon his termination.

## I. BACKGROUND

This is a breach of contract and retaliation case arising out of Dr. Murphy's employment with RIMI. Dr. Murphy had an Employment Agreement with RIMI; pertinent to this case, Section 14 gives some deference to a physician's professional medical judgment and Section 6 allows RIMI to terminate an employee for enumerated reasons, including for good cause.

Dr. Murphy was the attending physician on call when a well-qualified trainee contacted him about the care and treatment of a critically ill patient. ECF No. 96 ¶ 4. Dr. Murphy was not at the hospital at the time. *Id.* The trainee diagnosed the patient and identified the procedure, a cholecystostomy, he believed was required. After consulting Dr. Murphy where they talked about the case and reviewed the patient's x-rays, Dr. Murphy agreed with the course of treatment the trainee suggested and told him to perform the procedure. Dr. Murphy said that he would be available by phone and also available to come into the hospital if it became necessary. *Id.* ¶ 5. Dr. Murphy could not recall ever supervising a cholecystostomy without being physically present. *Id.* ¶ 8. The trainee successfully performed the procedure, and two additional unsupervised procedures that same day. *Id.* ¶ 6.

Lifespan's trainee supervision guidance comes from the Accreditation Counsel for Graduate Medical Education ("ACGME"), a national organization that establishes professional educational standards for trainees. *Id.* ¶ 11. The ACGME lists four levels of supervision, including direct supervision where the supervisor is physically present with the trainee and patient during critical parts of the procedure. *Id.* ¶ 12. And although the ACGME does not govern the way Medicare claims are billed, Chapter 12 of the Medicare Processing Manual ("CMS Manual") does, in order for RIMI to bill for an attending physician's services in supervising a trainee, that physician must directly supervise the trainee, i.e., be physically present during critical portions of the procedure. *Id.* ¶¶ 24-25. As part of its billing practices, RIMI relies on the attendings to not only properly document their role and presence in the medical record, but it also expects the physician to email RIMI personnel if they were not present to make sure RIMI does not improperly bill Medicare. *Id.* ¶¶ 26-27.

Shortly after the trainee performed the cholecystostomy in February and in compliance with RIMI's practice, Dr. Murphy informed RIMI that he was not physically present for the cholecystostomy and therefore, RIMI should not submit a bill for his services. *Id.* ¶ 2. It is not disputed that when Dr. Murphy informed RIMI that he was not present, RIMI did not send a bill. *Id.* ¶ 31.

When the RIMI Board of Directors met two weeks later, they discussed Dr. Murphy's indirect supervision of the trainee and asked Dr. John Cronan, an ex officio board member, to investigate. RIMI discovered other instances where Dr. Murphy did not directly supervise a trainee performing procedures that required

3

direct supervision. Dr. Cronan issued a reprimand letter and RIMI fined him $1300. *Id.* ¶¶ 33, 35. Dr. Murphy sent an email admitting that he did not provide direct supervision, and that he had to notify RIMI to "prevent fraudulent billing." *Id.* ¶ 37. He acknowledged that ACGME requirements changed, and he was not always aware of the changes, but he became aware that the procedure required direct supervision. He also referenced Section 14 in an effort to convince the Board to revoke the fine imposed based on his belief that that section provides RIMI with legal protection. *Id.* ¶ 39. He now states that he sent this email without legal advice and in an effort to smooth things over with RIMI. *Id.* ¶¶ 9-10.

RIMI ultimately terminated Dr. Murphy's employment for "good cause" under Section 6(v) of his Employment Agreement for failing to directly supervise the trainee during the procedure, which jeopardized patient care. *Id.* ¶ 18. RIMI also referenced negative performance notes unrelated to the supervision situation in his personnel file as additional grounds for termination. *Id.* ¶ 19.

In response to RIMI's assertion that he was terminated for "good cause," Dr. Murphy contends that RIMI retaliated against him for accusing RIMI of submitting false billing to Medicare related to teaching physician services. He pinpoints the February and April emails as evidence of "protected activity" and identifies emails he sent raising concerns/suggestions relative to trainee supervision and billing–in September and October 2015, he suggested changes to templates to reflect supervision, he sent three sets of emails from as early as November 2016 where he told RIMI he was not present for procedures so RIMI should not submit a

4

bill, and sent an April 2018 email where he proposed changes to allow a cholecystostomy to be performed without supervision. *Id.* ¶¶ 45-50. Dr. Murphy did not inform RIMI prior to his termination that other RIMI physicians were billing for teaching physician services that were not provided. *Id.* ¶ 21.

As part of his termination, RIMI paid Dr. Murphy the value of his shares as provided in the Employment Agreement. *Id.* ¶¶ 51-55. Those monies are now being held in escrow because Dr. Murphy objected to signing a full release of any potential claims upon the stock payment. *Id.* ¶¶ 56-57. He claims that he is entitled to be paid the fair market value of those shares, which he asserts is $5 million.

## II. STANDARD OF REVIEW

A party is entitled to summary judgment if the movant shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A party can show a genuine dispute by citing to materials in the record, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials," or by showing that the materials cited either do not establish a genuine dispute or are not supported by admissible evidence. *Id.* Summary judgment is mandated against a party who, given adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case ... on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A complete failure of proof of an essential element shows that there is "no genuine issue as to any material fact"

because if one element fails, all other facts are rendered irrelevant; it entitles the moving party to "judgment as a matter of law" because, by definition, the nonmoving party cannot carry their burden at trial. *Id.* at 323.

## III.   DISCUSSION

Dr. Murphy's Motion for Partial Summary Judgment asks the Court to interpret his Employment Agreement to find that RIMI overstepped its bounds when it terminated him based on his medical judgment to indirectly supervise the trainee. RIMI not only argues in opposition to Dr. Murphy's motion but also moves for partial summary judgment based on its interpretation of the contractual provisions. Therefore, the Court will treat this first issue as a cross-motion.

### A.   Breach of Contract – Count IV

Dr. Murphy argues that Section 14 should be interpreted as limiting RIMI's ability to terminate a physician based on his/her treatment of a patient. RIMI reads Section 14 as limiting its ability to challenge, direct, and control doctors' conduct in the specific area of diagnosis and treatment. These limits, RIMI asserts, would be within the scope of the treatment in the moment of care but not limiting RIMI's ability to review doctors' conduct after the fact and decide to terminate for good cause, which is allowed under Section 6, the provision governing termination.

"The determination of whether a contract's terms are ambiguous is a question of law to be decided by the court." *JPL Livery Servs., Inc. v. R.I. Dep't of Admin.*, 88 A.3d 1134, 1142 (R.I. 2014). "A contract is ambiguous when it is 'reasonably susceptible of different constructions.'" *Young v. Warwick Rollermagic Skating Ctr.,*

*Inc.*, 973 A.2d 553, 558 n. 6 (R.I. 2009) (quoting *Westinghouse Broad. Co. v. Dial Media, Inc.*, 410 A.2d 986, 991 (R.I. 1980)). "In determining whether or not a particular contract is ambiguous, the court should read the contract 'in its entirety, giving words their plain, ordinary, and usual meaning.'" *Young*, 973 A.2d at 558 (quoting *Mallane v. Holyoke Mut. Ins. Co. in Salem*, 658 A.2d 18, 20 (R.I.1995)). "[W]hile carrying out this task, the court should 'refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity * * * where none is present.'" *Young*, 973 A.2d at 559 (quoting *Mallane*, 658 A.2d at 20); *see also Paul v. Paul,* 986 A.2d 989, 993 (R.I. 2010) (recognizing that to a skilled advocate, "ambiguity lurks in every word, sentence, and paragraph * * * [so] the question is not whether there is an ambiguity in the metaphysical sense, but whether the language has only one reasonable meaning when construed * * * in an ordinary, common sense manner") (quoting *Garden City Treatment Ctr., Inc. v. Coordinated Health Partners, Inc.,* 852 A.2d 535, 542 (R.I. 2004)).

With the legal guidance set forth, the Court now turns to the two sections of the Employment Agreement that the parties identify to advocate for their interpretations. Section 14 discusses professional medical judgment:

> The Corporation undertakes that **in the specific area of diagnosis and treatment, the Employee's professional responsibility shall be unchallenged**, *and* **the Corporation will not, through its Board of Directors, or any of its officers or employees, direct, supervise or control the Employee in the Employee's professional care of any individual patient**; provided, however, that this Section 14 shall not prevent the Corporation from (i) promulgating general rules governing the rendering of medical care to patients or (ii) relieving the Employee of the care of an individual patient when, in the sole discretion of the

7

>
> Corporation's Board of Directors, the Employee is not observing such general rules.

ECF No. 86-9 at 7-8 (emphasis added). Section 6 discusses termination:

> "The employment of the Employee of the Corporation shall terminate . . . (v) at any time when the Corporation, acting in good faith and exercising reasonable discretion, determines that there exists 'good cause' to terminate the Employee's employment hereunder . . . ."
>
> **The Agreement defines "good cause" as follows**:
>
> The term 'good cause' as used in clause (v) above shall include, but not be limited to, events, conditions or circumstances occurring with respect to the Employee such as: (a) conviction of, or pleading nolo contendere to, a felony; (b) **gross negligence, dishonesty or fraud**; (c) **reckless misconduct**; (d) **dereliction of duty**; (e) **disregard of established, fundamental policies and procedures of the Corporation**; (f) being found to have engaged in any unprofessional or unethical conduct by any board, institution, organization or professional society related to the practice of medicine; (g) termination of employment required by any regulatory agency having jurisdiction over the Corporation; (h) termination, restriction or suspension of the Employee's staff privileges or credentialing at any hospital in Rhode Island, or at, by or with any other hospital or third-party payor at or for which the Corporation provides professional medical services; (i) inability or refusal to attain and maintain credentialing required by any hospital, physician organization, or third-party payor at, through or for which the Corporation provides professional medical services; (j) inability to be insured under professional liability plans at commercially reasonable rates; or (k) reporting to work under the influence of alcohol or other substance.

*Id.* at 4-5 (emphasis added).

8

The Court has reviewed these two sections[1] and finds that they are not ambiguous. Section 6 allows RIMI to terminate an employee for cause. Reading Section 14 as a whole and using the plain meaning of the words in it, the Court finds that this section defines the corporation's role within the specific area of its employee's diagnosis and treatment of a patient. The Corporation agrees not to challenge the employee's professional responsibility, i.e., ethics, in diagnosing and treating the patient and agrees not to direct, supervise, or control the employee in the care of an individual patient as it relates to diagnosis and treatment. As Dr. Murphy points out, "treatment" is defined as "the action or way of treating a patient or a condition medically or surgically" and this definition would include the cholecystostomy performed but would not include the act of supervising (or not) the trainee that performed it. ECF No. 85 at 16 n. 57.

Section 14 says nothing about termination, discipline for conduct, or an employee's employment status at all. The two provisions operate independently to address different aspects of the employment relationship. This interpretation makes sense from both the employer and employee perspectives because the employer cedes

---

[1] RIMI seeks to put Section 14 in context by discussing "the corporate practice of medicine" legal doctrine, arguing that it provides the basis for Section 14 and its priority of ensuring that a non-physician employer does not overrule a physician's medical judgment while diagnosing and treating a patient. Both parties cite caselaw from other jurisdictions where this legal doctrine was applied when a physician was terminated by his/her employer. While the Court finds the context to be informative, it declines to rest its determinations on decisions from other jurisdictions. Section 14's language is unambiguous and can be interpreted using simple definitions according to solid legal axioms. And reading it in the context of the entire Employment Agreement, its plain meaning is evident.

9

control to the professional when that matters most–while a patient is being diagnosed and treated–but the employer retains the right under Section 6 to terminate an employee post-diagnosis and treatment for good cause, including dereliction of duty. There is no limit in Section 14 which restricts the Corporation's right to terminate for any of the enumerated reasons.

With this interpretation in mind, the Court turns to the undisputed facts in the record. It is undisputed that RIMI did not interfere with the trainee's diagnosis of acute cholecystitis or Dr. Murphy's concurrence with that diagnosis. ECF No. 94 ¶ 74. It is undisputed that RIMI did not interfere with the trainee or Dr. Murphy's decision to perform a cholecystostomy to treat the patient. *Id.* ¶¶ 73-75. By all accounts, the trainee made the correct diagnosis and recommended and performed the appropriate treatment, which was ultimately successful in taking care of an ill person. RIMI only became involved when Dr. Murphy reported that it should not bill for his services. The patient's diagnosis and treatment were effectively over. RIMI questioned Dr. Murphy's determination that he did not need to directly supervise the trainee, not his medical judgment as to the particular patient's diagnosis, treatment, and care.

Dr. Murphy's interpretation of Section 14 is overbroad. He reads that section to provide that his indirect supervision of the trainee is treatment and patient care. He cites to different definitions (not contained in the contract) to explain "treatment," including "management and care of a medical condition" and then further defines "care" to mean "charge, supervision" to argue that "treatment" in Section 14 includes

10

supervision of trainees. The plain meaning of supervision when looked at in the context of what is considered "treatment" is clearly supervision of the patient's medical condition, not supervision of a trainee who might have physically treated the patient. The Court finds that the plain, ordinary meaning of "treatment" in Section 14 does not include providing educational supervision of a trainee performing the procedure.[2]

As to Section 6, RIMI asks the Court to hold as a matter of law that Section 14 does not limit or affect its right to terminate Dr. Murphy. The plain language of Section 6 makes clear that RIMI can terminate an employee for "good cause" and the section enumerates circumstances that qualify as such. Dr. Murphy does not address Section 6's language in detail but essentially argues that Section 14 hamstrings RIMI from making an adverse employment decision based on patient care. The way Dr. Murphy advocates that the Court read these two provisions together is not supportable. If Section 14 prohibits RIMI from taking any adverse action against its physicians from diagnosis to discharge, then it also guts Section 6 which gives RIMI's discretion to terminate for "good cause," including gross negligence, dereliction of duty, and failure to follow RIMI policies and procedures. Dr. Murphy's interpretation

---

[2] This is not a dispositive point, but it seems that federal medical reimbursement programs like Medicare and Medicaid also do not believe that indirect supervision of a trainee is tantamount to actually treating the patient since those programs will not reimburse RIMI for anything but direct, in person supervision. And Dr. Murphy agrees that it would have been fraudulent for RIMI to bill for his indirect supervision because it did not meet Medicare and Medicaid requirements. It only seems logical that if Dr. Murphy's supervision of the trainee from home was "treatment" of that patient then RIMI would have been able to bill for his services.

11

would make the Section 6 provisions of discharge meaningless. *Dubis v. E. Greenwich Fire Dist.*, 754 A.2d 98, 101 (R.I. 2000) (unambiguous contract provision language should be given ordinary meaning to avoid producing an absurd result); *Systemized of New England, Inc. v. SCM, Inc.*, 732 F.2d 1030, 1034 (1st Cir. 1984) ("a court must favor interpretations which give meaning and effect to every part of a contract and reject those which reduce words to mere surplusage").

The Court therefore concludes that Sections 14 and 6 in the Employment Agreement are not ambiguous. Section 14 governs RIMI and its Board's conduct to be deferential to the physician's care of an individual patient during the time he is diagnosing and treating that patient. Indirect supervision of a trainee is not included in the definition of treatment of a patient. Section 6 gives RIMI the power to terminate a physician for "good cause" as the section defines it. And because it is undisputed that RIMI did not interfere with Dr. Murphy's diagnosis and treatment of the patient requiring the cholecystostomy, the procedure went forward and was successful, RIMI did not breach Section 14 on this record. Whether RIMI breached Section 6 when it terminated Dr. Murphy for cause is an issue for a jury.

## B.  Federal and Rhode Island False Claims Act – Counts I and II

RIMI moves for summary judgment on Dr. Murphy's claims under the Federal and Rhode Island False Claims Acts ("FCA").[3] RIMI argues that these claims fail

---

[3] Because RIFCA mirrors the FCA, the Court treats the state claim analogously under this action. *New York v. Amgen Inc.*, 652 F.3d 103, 109 (1st Cir. 2011).

because Dr. Murphy cannot make out a prima facie case that he engaged in protected activity, i.e., that he notified RIMI of potentially fraudulent billing activity. Dr. Murphy counters that there are disputed issues of material fact as to his statutory retaliation claims.

Proof of an FCA retaliation claim requires meeting three prima facie elements that: "1) the employee's conduct was protected under the FCA; 2) the employer knew that the employee was engaged in such conduct; and 3) the employer discharged or discriminated against the employee because of his or her protected conduct." *Guilfoile v. Shields*, 913 F.3d 178, 187-88 (1st Cir. 2019) (quoting *Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 235 (1st Cir. 2004)). Protected activity is conduct that "reasonably could lead to a viable FCA action" such as "investigations, inquiries, testimonies or other activities" to alert the government about potential false claims. *Id.* at 188 (quoting *Karvelas*, 360 F.3d at 236, 237). Once a plaintiff makes out his prima facie case, the Court moves on to the burden shifting analysis under the *McDonnell-Douglas* case.

Dr. Murphy alleges that RIMI terminated him in retaliation for accusing RIMI of submitting false billing to Medicare based on his belief that RIMI was billing for teaching physician services when that physician did not directly supervise trainees performing the procedures as those programs require. As undisputed evidence of protected whistleblower conduct, he identifies a series of emails going back to 2015 where he raises various issues relating to billing and supervision of trainees.

13

- He emailed RIMI on February 27, 2018 to ensure that RIMI did not bill for his services on three procedures that he did not directly supervise the previous weekend (ECF No. 96 ¶ 29);

- He emailed RIMI on April 3, 2018 after he was reprimanded and fined for not appropriately supervising the February 2018 procedures, admitting to violating the ACGME supervision requirements but noting that he was unaware of a change in requirements (*Id.* ¶ 37);

- He sent emails in September and October 2015 suggesting changes to medical record templates to identify the level of supervision performed more specifically, but testified that he raised no concerns in those emails that RIMI was defrauding the government by inaccurately billing (*Id.* ¶¶ 44-47);

- He sent three sets of emails from as early as November 2016 where he told RIMI he was not present for procedures so RIMI should not submit bills for reimbursement (*Id.* ¶ 49); and

- He sent an April 12, 2018 email where he proposed changes to allow a cholecystostomy to be performed without supervision. *Id.* ¶ 50.

These reports are not protected activity under the FCA. It is undisputed that Dr. Murphy never communicated to RIMI that he believed that RIMI physicians were billing for teaching physician services when those physicians were not directly supervising trainees. *Id.* ¶¶ 21, 44-47. Dr. Murphy emailed RIMI, as he was required, to inform it that he had not directly supervised the trainee so RIMI should

14

not bill for his services. *Id.* ¶ 41. There was no suggestion of any conduct that could lead to an FCA action for false claims because the email assured that no fraud would occur because RIMI would not bill for Dr. Murphy's time. There is no evidence that RIMI knowingly submitted fraudulent bills to Medicare for services it knew were not provided.

As for notice,[4] Dr. Murphy testified that he did not communicate to RIMI that its physicians were billing for services that were not provided. *Id.* ¶ 21. The fact that he stated in the April 3rd email that he was informing RIMI that he was not present at the procedure "in order to prevent fraudulent billing" is not enough to put RIMI on notice of a potentially viable FCA claim. Because Dr. Murphy does not present undisputed evidence to meet the first two elements of an FCA prima facie case, the Court grants RIMI's Motion for Summary Judgment on Counts I and II.

### C. Rhode Island Whistleblower Protection Act – Count III

RIMI also moves for summary judgment on Dr. Murphy's Rhode Island Whistleblower Protection Act "(RIWPA"), R.I. Gen. Laws § 28-50-3(4), claim, arguing that there is no dispute that he did not engage in protected whistleblowing activity. To state a claim under RIWPA, a plaintiff must show that he engaged in protected

---

[4] RIMI argues that Dr. Murphy had to meet a heightened evidentiary standard because the caselaw requires that of employees whose job responsibilities relate to government billing or payments. *Maturi v. McLaughlin Rsch. Corp.*, 413 F.3d 166, 172-73 (1st Cir. 2005). The implication there is that because Dr. Murphy alerted RIMI to billing issues as part of his job, he would have to go beyond that to effectively alert RIMI and put it on notice of fraud. Because the Court finds that Dr. Murphy did not engage in protected activity or give RIMI notice of such activity under any standard, it will not weigh in on whether the *Maturi* heightened standard applies here.

15

whistleblowing conduct as defined in the statute. *Casey v. Manni*, 449 F. Supp. 3d 1, 3 (D.R.I. 2020). RIWPA defines protected conduct as when an employee "reports verbally or in writing to the employer ... [about] a violation ... of a law or regulation or rule promulgated under the laws of this state ... or the United States." R.I. Gen. Laws § 28-50-3(4). Dr. Murphy's RIWPA claim fails for the same reasons that his FCA claims fail. He has to show "(1) that he engaged in protected whistleblowing conduct … ; (2) that he suffered an adverse employment action at the time or thereafter; and (3) that the adverse action was causally related to the protected conduct." *Casey*, 449 F. Supp. 3d at 3.

Here, Dr. Murphy alleges that RIMI terminated him because he reported fraudulent billing. The evidence, which is the same as the evidence relied on in support of his federal and state FCA claims above, does not show that Dr. Murphy engaged in protected whistleblowing conduct. As such, his RIWPA claim fails and Count III is dismissed.

### D.    Damages – Count VI

RIMI moves for summary judgment on Dr. Murphy's damages claim, arguing that the 1993 Stockholder Agreement and 2010 Amendment[5] were not unconscionable and provide a just calculation for his share payout of $348,527.[6] It

---

[5] Dr. Murphy has not pled claims for breach of contract based on the terms of the 1993 Agreement or the 2010 amendment. Count IV is a breach of contract relating to termination without cause and references his belief that his buyout was done under "unfair terms," but it does not allege that RIMI breached those agreements.

[6] RIMI offered him that sum but the parties could not agree on release language; RIMI wanted a full release, which it argues was a customary practice with

16

argues that the Court cannot invalidate the Agreement and award damages based on some other calculation, so the jury need not hear evidence of RIMI stock's fair market value.

In response to RIMI's motion, Dr. Murphy acknowledges that the Agreement was not unconscionable at the time it was formed. He clarifies in his objection that Count VI is not a cause of action but a conditional request for an alternate remedy if RIMI is found liable, but Dr. Murphy is not reinstated as a shareholder. He seeks a determination that, because of his wrongful termination, it would be inequitable and unconscionable to apply the terms of the Agreement to limit the value of Dr. Murphy's stock. He argues that he is entitled to be made whole and be paid the fair market value of his RIMI stock because RIMI should not be permitted to profit from illegally firing him.

The Court will deal with any issues relating to damages as the case progresses to trial. But because it is not a legal claim, the Court grants RIMI's Motion for Summary Judgment as to Count VI.

## IV. CONCLUSION

The Court GRANTS RIMI's Motion for Partial Summary Judgment. ECF No. 87. Counts I, II, and III are DISMISSED. The Court DENIES Dr. Murphy's Motion for Partial Summary Judgment as to Count IV (ECF No. 85) and GRANTS RIMI's Cross-Motion for Partial Summary Judgment as to Count VI (ECF No. 92-1

---

other physicians who left its employ and Dr. Murphy wanted to reserve the right to assert claims related to the stock.

17

at 3). Remaining for trial is Dr. Murphy's claims for breach of contract (Counts IV and V) in light of the way the Court interpreted that contract set forth here.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
Chief United States District Judge

November 22, 2024

18